# DECLARATION

MARK LEFKOW, the Declarant, states on oath and deposes as follows:

1.

My name is Mark Lefkow. I am over the age of eighteen (18) years and am legally competent to make this Declaration. The facts stated in this Declaration are within my personal knowledge.

2.

I am counsel for Kerry Koon in his lawsuit against the owners of accounts that received funds from Mr. Koon through fraudulent means. Pursuant to Fed. R. Civ. P. 65(b)(1)(B), I certify that I have not given notice to Defendants or the bank that maintained the beneficiary account of the wire transfer from Mr. Koon that is the subject of this case of Plaintiff's Motion for Temporary Restraining Order in the lawsuit because of the nature of the scheme alleged by Plaintiff, including the improper accessing or hacking of communications relating to a real estate transaction, the transmittal of false wire instructions, and the use of a bank account at Citibank to divert funds from business transactions taking place in Suth Carolina. These facts suggest, based on my experience with similar cases, that notice to Defendants and their banking institutions will encourage Defendants to abscond with the stolen funds further.

3.

I have been admitted to practice law in the State of Georgia since 2000. I have handled more than twenty cases involving fraudulent wires, fraudulent ACH's, and fraudulent diversions of funds from lawyers and businesses, in both state courts and federal courts. In my experience handling these cases, once parties to a fraudulent wire scheme are notified that legal proceedings are pending, they typically take actions to further move the funds beyond the reach of Court process, including issuing cashier's checks, utilizing second-level money mule accounts both at the recipient bank and banks holding other accounts, purchasing digital assets such as Bitcoin, and wiring funds domestically and overseas. Because of banking privacy laws, banks will not disclose information allowing us to locate the beneficial owners and persons controlling the recipient bank accounts in cases of wire fraud absent pre-service discovery, specifically subpoenas. We are unable to locate the accountholders in this case because of these banking privacy laws.

4.

Likewise, giving advance notice to the bank housing the beneficiary account in fraudulent wire cases has also resulted in funds moving beyond the reach of Court process. In one prior case I handled, a beneficiary bank issued a certified check to the accountholder of funds fraudulently wired in response to my client's notice of

fraud and request to refund the wire. In another case, the beneficiary bank allowed the accountholder receiving fraudulently diverted funds to open a new account, and then the money mule transferred funds to this new account to avoid a wire reversal from the sending bank. These bank actions have created and continue to create additional difficulty in recovering fraudulently diverted funds and counsel that giving notice to recipient banks puts stolen funds further at risk.

5.

As to the scope of the injunction sought by the Plaintiff in this case and the additional accounts sought to be enjoined, I have handled cases where transferees of fraudulent wires and ACH transfers have opened multiple accounts, whether at the same bank that received the transfer or at other financial institutions. These other accounts shelter and hide the fraudulently transferred funds from wire reversals and law enforcement until the person directing the scheme calls upon the money mule to transfer or move the funds through various means, including purchasing Bitcoin and other digital assets, issuing certified checks, wire transfers, ACH transfers, and deposits into other money mules' accounts. In one case, the money mule whose account received fraudulent wires opened accounts at two banks and, immediately upon receiving fraudulent transfers, wrote checks to herself that she then deposited in her account at a second bank. In another case, the money mule opened multiple

accounts at the same bank to avoid wire reversals, then withdrew funds at automated teller machines from these other accounts at the same bank.

6.

As to the timing for the hearing on the preliminary injunction, the recipient bank will usually take time to respond to a subpoena regardless of the time set for compliance. I have typically set subpoena compliance for recipient banks within the 14 days for the duration of a temporary restraining order, but despite quick action to get banks served with subpoenas and the TRO, I have an approximately 20% success rate in gaining full compliance by the time of the hearing. However, in many cases, within those fourteen days, I have succeeded in obtaining contact information for the accountholder, making contact with the accountholder, and determining what, if anything remains in the recipient account and related account(s) and determining whether the accountholder consents to injunctive relief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this, the 10th day of February, 2025.

**MARK LEFKOW**
**Declarant**